FILED ✓ ____ RECEIVED
____ ENTERED ____ SERVED ON
COUNSEL/PARTIES OF RECORD

OCT 0 6 2025

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ _____ DEPUTY

Jade Riley Burch
Plaintiff, Pro Se
222 Karen Avenue, Unit 1207
Las Vegas, NV 89109
Tel: (614) 725-9452
Email: jaderburch@gmail.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **Jade Riley Burch,** | **Case No.:** |
| Plaintiff, Pro Se, | 2:25-cv-01897-MMD-DJA |
| vs. | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF (JURY DEMAND)** |
| **Navy Federal Credit Union; Speedy Recovery, Inc.; and Does 1–10,** | |
| Defendants. | |

### PLAINTIFF'S PRE-SUIT COMPLIANCE AND DEFENDANTS' BAD FAITH

Plaintiff made diligent efforts to resolve this matter prior to filing suit. Plaintiff provided Defendants with detailed pre-litigation notices outlining the claims and legal bases for relief, issued a formal litigation-hold letter on August 9, 2025 demanding preservation of all evidence, sent a comprehensive settlement demand package on September 8, 2025 via tracked delivery to NFCU's principal office, and sent multiple emails requesting resolution and providing notice of legal claims.

Despite these efforts, Defendants ignored the litigation-hold letter, failed to respond to the settlement demand, ignored all email correspondence, disposed of the collateral without providing required UCC notices to Plaintiff, and concealed or

failed to preserve relevant records. This conduct demonstrates Defendants' bad faith and disregard for their legal obligations.

Having exhausted pre-litigation remedies, Plaintiff brings this action to protect her rights and seek appropriate relief. Plaintiff conducted extensive pre-filing investigation, obtained expert documentation of damages (Tesla service reports), provided detailed notice of legal theories, and made good-faith settlement efforts. All claims are warranted by existing law or non-frivolous arguments for extension of law.

## I. INTRODUCTION

¶1. This action arises from Defendants' unlawful repossession of Plaintiff's Tesla Model 3 AWD from a clearly marked accessible parking space in Downtown Summerlin, Nevada, during extreme 106°F heat, while Plaintiff's valid handicap placard was displayed.

¶2. Defendants repossessed without providing a contractual right-to-cure or final demand notice (Exhibit F), seized life-sustaining medical equipment (Exhibit G), mishandled the vehicle by allowing the battery to discharge to 0% and towing without Tow Mode (Exhibit X), commissioned a replacement key fob (Exhibit Y), and prepared the vehicle for sale without authenticated pre-disposition notice required by NRS 104.9611.

¶3. As a result, Plaintiff suffered a documented seizure, medical emergency, property loss, economic harm, and severe emotional distress.

¶4. Plaintiff also seeks a declaration that any alleged deficiency is barred by Defendants' failures under NRS 104.9610–.9614 and 104.9626.

¶5. An actual controversy exists regarding deficiency liability because: (a) NFCU continues to report a $27,118 balance to credit agencies (Exhibit W-2); (b) NFCU's post-repossession conduct and billing statements indicate an outstanding balance claim; and (c) NFCU has refused to provide a full accounting under NRS 104.9210 despite authenticated requests. The threat of deficiency collection is real and immediate, creating a justiciable controversy under the Declaratory Judgment Act. See Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941) (controversy must be "definite and concrete").

¶6. Plaintiff brings this action individually. Discovery may reveal patterns or practices that could support class allegations, at which time Plaintiff will seek leave to amend.

¶7. All claims are timely. For any claim where Defendants might argue limitations issues, the applicable statute of limitations was tolled by: (a) NFCU's fraudulent concealment of account information in "Inactive Accounts" portals; (b) Plaintiff's diligent pursuit of her rights through CFPB complaints and pre-litigation notices; and (c) Defendants' ongoing pattern of misconduct including continued false credit

reporting. See Muhammad v. Warden, 902 F.3d 1076, 1081 (9th Cir. 2018) (fraudulent concealment tolls limitations periods).

---

## II. JURISDICTION AND VENUE

¶8. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's Complaint asserts claims under the Americans with Disabilities Act (42 U.S.C. § 12182), the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.), the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.), and the Equal Credit Opportunity Act (15 U.S.C. § 1691 et seq.).

¶9. No federal preemption applies to Plaintiff's state law claims. The National Credit Union Act does not preempt state contract, tort, or UCC claims against federal credit unions. See Waters v. Navy Fed. Credit Union, 2018 WL 2331113, at *3 (E.D. Va. May 23, 2018) (NCUA does not preempt state law claims); 12 C.F.R. § 701.31 (federal credit unions subject to state repossession laws). Plaintiff's state law claims involve traditional areas of state regulation—secured transactions, negligence, contract, and consumer protection—and do not conflict with federal banking objectives.

¶10. The Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367(a), because those claims form part of the same case or controversy.

¶11. Declaratory relief is authorized by 28 U.S.C. §§ 2201–2202.

¶12. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in Clark County, Nevada, and Defendant Speedy Recovery, Inc. resides in this District. For venue purposes, a defendant entity resides in any district where it is subject to personal jurisdiction. 28 U.S.C. § 1391(c)(2).

¶13. Defendant Navy Federal Credit Union does business extensively in Nevada through its branches, lending, and debt collection activities, and Defendant Speedy Recovery, Inc. is a Nevada entity that conducted the repossession at issue. Accordingly, this Court has personal jurisdiction over both Defendants. This Court also has specific personal jurisdiction over all Defendants because they purposefully directed the repossession and related conduct at Nevada and the claims arise from that forum-related activity; exercising jurisdiction is reasonable.

## III. PARTIES

¶14. Plaintiff Jade Riley Burch is a Nevada resident with seizure disorders and the titled owner of the repossessed Tesla vehicle.

¶15. The collateral is a 2021 Tesla Model 3 AWD, VIN ending 9112. For later reference, the last four digits 9112 are used.

¶16. Defendant Navy Federal Credit Union ("NFCU") is a federally chartered credit union headquartered in Vienna, Virginia, conducting business in Nevada. NFCU will be served at its principal place of business in Virginia, consistent with Fed. R. Civ. P. 4 and applicable law.

¶17. Defendant Speedy Recovery is a Nevada business entity (exact form unknown), sued as "Speedy Recovery, Inc." pending confirmation; Plaintiff will amend to conform to proof. Speedy's business address is 4517 Vandenberg Dr, North Las Vegas, NV 89081. Speedy acted as NFCU's authorized repossession contractor and agent.

¶18. Does 1–10 are third-party repossession and auction contractors, including ADESA and Victory Recovery, whose true names and capacities are presently unknown. The identities of Doe defendants are ascertainable through: (a) NFCU's vendor contracts and repossession assignment records; (b) Tesla service records showing ADESA's key programming on August 8, 2025 (Exhibit Y); (c) vehicle transportation logs; and (d) auction records from the vehicle's sale. Plaintiff will move to amend and substitute true names within 90 days of initial disclosures or earlier upon identification.

### Agency and Ratification

¶19. At all relevant times, Speedy, ADESA, Victory Recovery, and other Doe Defendants acted as NFCU's agents, ostensible agents, contractors, and/or sub-

agents because: (a) NFCU directed which vehicle to repossess and when through specific assignment instructions; (b) NFCU's loan documents and repossession authorization dictate repossession procedures and grant authority to repossess; (c) NFCU controlled disposition of the vehicle after repossession through exclusive authority to approve sale; (d) NFCU ratified Speedy's and other contractors' conduct by accepting the repossessed vehicle, proceeding with sale, and accepting the benefits of the disposition; (e) payment to contractors was contingent on successful repossession creating financial incentives; and (f) required reporting protocols and oversight mechanisms. NFCU authorized, directed, controlled, ratified, or knowingly accepted the benefits of their conduct and is vicariously liable under Nevada law. Plaintiff reasonably relied on NFCU's manifestations and the contractors' conduct indicating agency, establishing ostensible agency under Nevada law.

¶20. NFCU is jointly and severally liable for all acts and omissions of Speedy and other agents. Each Defendant purposefully directed activities at Nevada and the claims arise out of those forum-related activities.

## PLAINTIFF'S SUMMARY OF THE CASE

They took a Tesla from a clearly marked ADA space while a valid placard was displayed, in 106°F heat, with Plaintiff's medication inside. She suffered a

documented seizure. The battery was then degraded to the point Tesla now recommends full HV-battery replacement. The car was sold after litigation-hold notice. That's the case.

## IV. FACTUAL BACKGROUND

### A. Pre-Repossession Conduct

¶21. Plaintiff maintained a loan with NFCU for her 2021 Tesla Model 3 AWD, a consumer good used primarily for personal, family, or household purposes, pursuant to a written ePromissory Note, Security Agreement, and Disclosure dated July 1, 2021 (the "Loan Agreement," attached as Exhibit 3 and also designated as Exhibit K). The Loan Agreement governs the rights and duties of the parties. Critically, the Security Agreement within the Loan Agreement expressly requires NFCU to "protect the collateral" and imposes duties of reasonable care in its custody. The Security Agreement also appoints NFCU as Plaintiff's "attorney-in-fact" with authority to take steps to protect the collateral. Exhibits 1, 2, and 3 are attached hereto. Other exhibits cited are incorporated by reference under Fed. R. Civ. P. 10(c) and will be filed in discovery or on motion.

¶22. NFCU accepted payments totaling at least $6,071 (Exhibit K) while planning repossession without issuing required cure or demand notices (Exhibit F).

## Waiver and Estoppel

¶23. By accepting Plaintiff's payments totaling at least $6,071.00 (Exhibit K) while simultaneously planning and executing a repossession, NFCU engaged in a course of conduct inconsistent with an intent to enforce its "without prior notice" repossession right. Plaintiff reasonably relied on this conduct—the continued acceptance of payments—as a signal that her account was in good standing and that default remedies would not be imminently exercised without warning.

¶24. NFCU is therefore estopped from relying on the "without prior notice" clause, and is deemed to have waived its enforcement. A creditor cannot lull a borrower into a false sense of security by accepting payments and then spring a repossession without any final demand or cure notice. See, e.g., Ocwen Loan Servicing, LLC v. Schmitz, 2015 WL 4477493, at *4 (D. Nev. July 21, 2015) (noting that waiver can be inferred from a course of conduct).

## Unconscionability

¶25. To the extent the "without prior notice" clause is interpreted to permit a repossession under the circumstances presented here—where the debtor is making payments, the vehicle is parked in an ADA-accessible space with a visible placard, and life-sustaining medical equipment is seized—the clause is both procedurally and substantively unconscionable. It amounts to an oppressive and one-sided provision that shocks the conscience and violates public policy, rendering it

unenforceable. See See Chesnut v. Second Judicial Dist. Court, 133 Nev. 1, 389 P.3d 303, 305–06 (2017)

### B. The June 18, 2025 Repossession

¶26. On June 18, 2025, Plaintiff attended a medical appointment near Downtown Summerlin with her caretaker, Porscha Ryan. After the appointment, they stopped briefly to get food. Plaintiff's Tesla was legally parked in a clearly marked ADA-reserved accessible parking space, with a valid ADA-reserved accessible placard displayed (Exhibit C).

¶27. Upon returning, the vehicle was gone. Plaintiff's Tesla app showed it in motion, being towed to Speedy Recovery, Inc.'s lot in North Las Vegas (Exhibit E).

¶28. Speedy, acting as NFCU's authorized agent, seized the vehicle without cure or demand notices, taking essential medical equipment (inhaler, EpiPen, Ativan, Humalog insulin pen, and prescriptions) (Exhibit G).

¶29. The repossession occurred in 106°F heat (Exhibit H), disregarding Plaintiff's ADA-protected status (Exhibits C, I), causing a documented seizure requiring emergency treatment (Exhibits A, B, D, D-2).

¶30. Speedy failed to engage Tow Mode, allowed the battery to discharge to 0%, and commissioned a replacement key fob, causing damage (Exhibits X, Y). NFCU is jointly and severally liable for Speedy's misconduct.

### C. Improper Vehicle Handling and Storage

**Why the Battery Damage Matters:** Electric vehicle batteries are extremely sensitive to heat and improper handling. Tesla explicitly warns against both in its owner's manual. Defendants ignored every single warning, causing catastrophic damage that now requires an $18,000 replacement. This wasn't an accident—it was the predictable result of storing a high-tech vehicle like it was a junked gas-powered car.

¶31. Tesla's Owner's Manual warns against extreme temperatures and towing without Tow Mode, risking battery and drivetrain damage (Exhibit X). Defendants stored the Tesla in outdoor Nevada lots in extreme heat, violating NRS 104.9207(1)'s duty of reasonable care and NFCU's express contractual duty to "protect the collateral."

¶32. The battery discharged to 0%, and improper towing caused foreseeable harm. Defendants commissioned a replacement key fob (Exhibit Y), indicating improper access during repossession. Tesla app logs show charging and resale preparations without NRS 104.9611 pre-disposition notification, rendering the disposition not commercially reasonable under NRS 104.9610 (Exhibit Y).

¶33. On August 8, 2025, ADESA programmed a new key card while Plaintiff retained digital control, evidencing unlawful resale preparations (Exhibit Y).

¶34. Tesla issued a service invoice dated October 1, 2025, confirming the high-voltage battery required full replacement because the vehicle could not charge beyond approximately 30% of expected capacity (Exhibit 2). Tesla service/app records show a "100%" charge yielded ~90 miles of range (~29% of the expected ~320 miles), demonstrating severe degradation (Exhibit EE). The replacement cost is $12,000–$18,000.

### D. Post-Repossession Concealment and Spoliation

¶35. NFCU continued billing Plaintiff and reporting false account status while ignoring certified notices and demand letters (Exhibit W). Plaintiff sent multiple notices via certified mail, express mail, and email, and filed CFPB complaints, but NFCU did not respond.

¶36. When Plaintiff retrieved her property, Defendants denied vehicle access, delivering belongings in trash bags, including medical equipment, violating NRS 104.9207(1) (Exhibit G).

¶37. After July 2025, NFCU concealed the loan in an "Inactive Accounts" section, hiding invoices (Exhibits Z, W-3, W-4) despite Plaintiff's disputes, impeding access to payoff/redemption information required under NRS 104.9210.

**¶37A. NFCU's Immediate and Sustained Notice of Plaintiff's Correct Identity and Escalating Legal Actions**

"Following the unlawful repossession, Plaintiff immediately and repeatedly notified NFCU of her correct legal name, current contact information, and the formal legal actions, creating an irrefutable record that contradicts NFCU's later-fabricated documentary defense. The timeline of notice is conclusive and demonstrates a deliberate pattern of ignoring her correct identity:

1. **June 22, 2025:** Four days post-repossession, Plaintiff emailed NFCU's Collateral Risk department as **'Jade Riley Burch (FKA Joshua P. Burch)'** with a formal settlement demand.

2. **July 2, 2024:** Plaintiff sent a pre-litigation email to NFCU's legal team, identifying as **'Jade Riley Burch'** and attaching a draft complaint.

3. **July 4, 2025:** Plaintiff sent a detailed **$175,000 settlement demand** to NFCU's Legal Department and Office of the President.

4. **July 10-15, 2024:** Plaintiff escalated to NFCU's **Board of Directors, CEO, and ADA Compliance Officer**, providing CFPB and DOJ complaint numbers and final litigation notices.

5. **August 9, 2025:** Plaintiff sent a formal **Litigation Hold** letter to NFCU's General Counsel and executives, notifying them of imminent federal filing.

6. **August 11, 2025:** NFCU's Collateral Risk department **confirmed reading** the litigation hold notice.

Despite this immediate, sustained, and high-level campaign of communication— which provided NFCU's leadership with Plaintiff's correct name, current address,

and clear notice of federal litigation—NFCU's purported June 21, 2025 'Notice of Repossession' was addressed to 'Joshua P Burch' at an outdated address. This irrefutable timeline proves the notice was not sent on June 21, 2025, but was fabricated for this litigation after NFCU realized the severity of its legal exposure."

¶38. NFCU's CFPB call acknowledged litigation intent, yet it concealed records, constituting spoliation under Fed. R. Civ. P. 37(e)(2). NFCU initially dismissed Plaintiff's first CFPB complaint claiming she was "not our customer" despite having her loan number, VIN, and complete correspondence history. Only after Plaintiff provided birth certificate, multiple forms of ID, and legal name change documentation in response to NFCU's excessive verification demands did NFCU acknowledge her identity and respond to a second CFPB complaint. This pattern of requiring extraordinary transgender-specific documentation not typically required for routine account matters demonstrates discriminatory treatment based on gender identity (Exhibit W).

¶39. Defendants sold and transferred the vehicle identified by VIN ***9112 after receiving Plaintiff's litigation-hold letter (dated August 9, 2025) and pre-suit notices, thereby destroying native ESI embedded in the vehicle (telemetry, key-pair logs, service history) and third-party auction metadata critical to proving the extent of damage and commercially unreasonable disposition.

¶39A. On July 12, 2025, Plaintiff filed CFPB Complaint #250712-22270607 detailing the unlawful repossession and providing complete account information

including loan number, VIN, and correspondence history. NFCU responded by claiming Plaintiff was an "unauthorized third party" despite having access to these account details. On July 15, 2025, Plaintiff filed CFPB Complaint #250715-22348848 with complete name change documentation including birth certificate and court orders. NFCU then represented to the CFPB that their review was in progress. On September 11, 2025, Plaintiff filed CFPB Complaint #250911 23987008, which remains open with NFCU's response in progress as of September 12, 2025.

¶39B. For 58 days—from July 15, 2025 through September 11, 2025—NFCU did not produce any pre-disposition notices to the CFPB despite Plaintiff's specific dispute regarding lack of notice under NRS 104.9611 in complaints #250712-22270607 and #250715-22348848. NFCU's July 21, 2025 interim response to the CFPB stated only "Our review of this matter is in progress and we will respond as soon as possible," with no mention of any notices. On September 11, 2025—the same date Plaintiff filed her third CFPB complaint (#250911-23987008) and three days after Plaintiff served NFCU with a draft federal complaint on September 8, 2025, **and following Plaintiff's August 9, 2025 litigation hold letter which NFCU acknowledged reading on August 11, 2025**" (tracking #884205991608 and #884205933822, both delivered and signed for)—NFCU suddenly produced to the CFPB two purported notices: (1) a July 25, 2024 "right to cure" letter, and (2) a June 21, 2025 "Notice of Repossession and Our Plan to Sell Property." Both documents were addressed to "Joshua P Burch" at 1871 Hollywell St, Las Vegas, NV 89135-3348—Plaintiff's

former legal name. Plaintiff never received these notices at any address. The temporal proximity between litigation service and document production, combined with the 58-day period during which NFCU claimed to be "reviewing" without producing these allegedly existing documents, combined with the use of Plaintiff's former legal name after NFCU had been notified of the legal name change through the CFPB process, combined with NFCU's failure to provide any proof of actual delivery, creates a reasonable inference that the documents were created, materially altered, or backdated in response to this litigation rather than contemporaneously mailed as claimed.

¶39C. NFCU's shifting positions demonstrate a pattern of obstruction. After denying Plaintiff's identity in CFPB Complaint #250712-22270607 and claiming for 58 days across multiple complaints that no notices were available, NFCU suddenly produced two purported notices to the CFPB in response to Complaint #250715-22348848. NFCU then immediately closed Complaint #250715-22348848, representing the matter as resolved. This forced Plaintiff to file a third CFPB complaint (#250911-23987008) on September 11, 2025 specifically to: (1) challenge the authenticity of the newly produced documents as fabricated litigation responses created after receiving Plaintiff's September 8, 2025 pre-suit settlement demand; (2) detail the internal inconsistencies in NFCU's own billing records that contradict the purported notices; and (3) attach the draft federal complaint. This third complaint remains open, with the federal complaint now formally submitted as an attachment to the CFPB. NFCU's tactic—producing questionable documents after a 58-day

delay, then immediately closing the CFPB complaint to avoid further scrutiny of the documents' authenticity—confirms the documents were generated for litigation defense and demonstrates a systematic pattern of bad faith that warrants sanctions.

¶39D. Plaintiff retained digital access to the Vehicle through the Tesla mobile application until October 1, 2025. During this period, Plaintiff could monitor the Vehicle's location, charging status, and service appointments. When the new owner attempted to schedule service appointments at Tesla on September 25 and October 1, 2025, Plaintiff received notifications and was able to cancel the first appointment. On October 1, 2025—the same day the second service appointment was scheduled—Defendants finally terminated Plaintiff's digital access to the Vehicle, permanently destroying Plaintiff's ability to retrieve telemetry data, charging logs, service history, and other electronically stored information embedded in the Vehicle's systems. This access termination occurred nearly two months after Plaintiff's August 9, 2025 litigation hold letter, and only after the new owner's service appointments revealed Plaintiff still had control. The timing demonstrates Defendants' awareness of the preserved ESI and their deliberate decision to destroy Plaintiff's access to this critical evidence.

**E. Pre-Suit Settlement Efforts**

¶40. Before filing, Plaintiff provided Defendants with detailed pre-litigation notices outlining the legal violations and extended an opportunity to resolve the matter. On

August 9, 2025, Plaintiff sent a formal litigation-hold letter demanding preservation of all evidence. On September 8, 2025, Plaintiff sent a comprehensive settlement demand package including detailed legal analysis and draft complaint to NFCU's principal office via tracked delivery (tracking #884205991608 and #884205933822, both delivered and signed for). Plaintiff also sent multiple emails to NFCU requesting resolution and providing notice of legal claims. Defendants ignored all communications—the litigation-hold letter, the settlement demand, and all email correspondence—while simultaneously destroying evidence by selling the vehicle. This pattern demonstrates bad faith and disregard for legal process. Defendants' continued violations after receiving notice of legal claims demonstrates willful disregard warranting enhanced penalties.

¶40A. Plaintiff's pre-litigation notices were not sent merely to generic customer service, but to NFCU's highest levels of leadership and oversight, including: legal@navyfederal.org, compliance_officer@navyfederal.org, boardofdirectors@navyfederal.org, officeofthepresident@navyfederal.org, ada.compliance@navyfederal.org, and regulatory@navyfederal.org, Collateral_Risk@navyfederal.org among others. This ensured institutional knowledge at the executive, legal, compliance, and board levels. Despite notice to these decision-makers with authority to halt the unlawful disposition, NFCU proceeded to sell the Vehicle, demonstrating willful institutional misconduct warranting punitive damages and sanctions."

**Reservation of Rights:** Plaintiff reserves the right to amend this Complaint to add claims and parties as discovery proceeds.

---

## PLEADING IN THE ALTERNATIVE

Plaintiff pleads certain claims in the alternative to account for potential variations in proof or legal interpretation. However, the core factual narrative—Defendants' unlawful seizure, discriminatory conduct, and reckless destruction of property—unifies all counts. Plaintiff has consolidated all conceivable legal theories arising from this single transaction to promote judicial economy and avoid piecemeal litigation. Should the Court find one theory inapplicable, the foundational facts amply support the others. While pleaded in the alternative where appropriate, each claim presents a distinct legal theory with specific elements and damages. There is no improper duplication. The factual basis for each claim is specifically alleged with reference to particular defendants, dates, and exhibits.

**Note to the Court:** To assist the Court's review, Plaintiff has included a brief plain-language summary of the legal claims following the Causes of Action section. This summary is provided for clarity only and is not part of the formal pleadings.

---

## V. CAUSES OF ACTION

## COUNT I: NEVADA UCC NOTICE & DISPOSITION VIOLATIONS

**(NRS 104.9610–.9611, 104.9613–.9614, 104.9625–.9626) — Against NFCU and Does**

¶41. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶42. Under Nevada Nat'l Bank v. Huff, 94 Nev. 506 (1978), creditors must comply with UCC notice and disposition requirements. NRS 104.9611 requires authenticated notification before disposition of collateral, NRS 104.9613 prescribes required contents, NRS 104.9614 mandates reasonable timing, and NRS 104.9610 requires commercially reasonable disposition. Under NRS 104.9210, a secured party must provide a complete accounting upon authenticated request.

¶43. Defendants failed to provide required pre-disposition notification under NRS 104.9611 (Exhibit F). No authenticated notice satisfying NRS 104.9613(1)(a)–(g) was provided, and no reasonable time under NRS 104.9614 elapsed before disposition. Plaintiff made multiple authenticated requests for accounting under NRS 104.9210, which NFCU ignored while concealing records in "Inactive Accounts" (Exhibits Z, W-3, W-4).

¶43A. NFCU uploaded purported notices to the CFPB portal only on September 11, 2025, in response to CFPB Complaint #250715-22348848, three days after Plaintiff sent NFCU a pre-suit settlement demand package including a draft complaint via tracked delivery on September 8, 2025 (tracking #884205991608 and

#884205933822, both delivered and signed for). Plaintiff never received any pre-disposition notices—not before repossession, not after, and not at any time. The documents NFCU produced to the CFPB on September 11—a July 25, 2024 "right to cure" letter and a June 21, 2025 "Notice of Repossession and Our Plan to Sell Property"—were both addressed to "Joshua P Burch," Plaintiff's former legal name, despite NFCU having updated Plaintiff's legal name in its own records to Jade Riley Burch following receipt of extensive identity documentation through CFPB Complaint #250715-22348848.

¶43A-1. NFCU's own billing statements contradict any claim that proper pre-disposition notice was provided. NFCU sent Plaintiff billing statements dated June 21-July 20, 2025 (statement period immediately following the June 18, 2025 repossession) and July 21-August 20, 2025. Both statements prominently state: "This account statement is provided to you for informational purposes only and should not be construed as an attempt to contact you for payment. This is not an attempt to collect a debt." These disclaimers prove NFCU was not attempting to provide notice or collect on the debt during the critical post-repossession period when NRS 104.9611 and 104.9613 require authenticated pre-disposition notification. The June 21-July 20, 2025 statement was addressed to "Joshua P Burch," while the July 21-August 20, 2025 statement was addressed to "JADE R BURCH." This name change occurred only after Plaintiff provided extensive identity documentation through CFPB Complaint #250715-22348848 filed July 15, 2025, demonstrating that NFCU updated its records in late July 2025 in response to

Plaintiff's legal documentation. Yet the purported June 21, 2025 "Notice of Repossession" that NFCU produced to the CFPB on September 11, 2025—months after updating Plaintiff's name in its system—was still addressed to "Joshua P Burch," creating a reasonable inference that this document was created from outdated templates rather than contemporaneously sent.

¶43A-2. NFCU has provided no proof of delivery whatsoever: no certified mail receipts, no tracking numbers, no signature confirmation, no postal service records of any kind. Given the critical importance of pre-disposition notice under NRS 104.9611, NFCU's claimed reliance on regular first-class mail without any delivery confirmation, combined with use of Plaintiff's former legal name after updating internal records to reflect the legal name change, combined with billing statements expressly disclaiming any attempt to contact for payment, fails to satisfy NRS 104.9613's requirement that notification be "sent" in a commercially reasonable manner calculated to provide actual notice.

¶43B. The temporal sequence is devastating to NFCU's credibility: On July 21, 2025, NFCU told the CFPB "Our review of this matter is in progress and we will respond as soon as possible," without mentioning any existing notices. For 51 additional days (July 21 through September 11), NFCU continued claiming the review was "in progress" while Plaintiff repeatedly disputed the lack of notice in complaints #250712-22270607 and #250715-22348848. Then, on September 11, 2025—three days after Plaintiff sent NFCU a pre-suit settlement demand package

including a draft complaint via tracked delivery and the same day Plaintiff filed her third CFPB complaint—NFCU suddenly "found" two notices allegedly mailed nearly a year earlier (July 2024) and three months earlier (June 2025). No credible secured party in actual compliance with NRS 104.9611 would fail to produce notice evidence to a federal regulator for 58 days during an active investigation specifically challenging the existence of such notices, then immediately locate and produce them only after receiving a litigation threat. This pattern creates a reasonable inference that the documents were created, materially altered, or backdated in response to the litigation threat. At minimum, the suspicious timing and circumstances warrant shifting the burden to NFCU to prove compliance through authenticated delivery records, which NFCU has failed to provide despite the legal requirement under NRS 104.9613 that notice be "authenticated" and "sent."

¶44. The disposition was not commercially reasonable under NRS 104.9610(2) due to improper vehicle handling, battery discharge to 0%, unauthorized re-keying, and failure to follow Tesla-specific protocols (Section IV.C). Because the collateral was returned to market with a materially degraded high-voltage battery (approximately 90 miles at "100%" charge, less than 29% of expected range), confirmed by Tesla's invoice requiring HV-battery replacement (Exhibit 2), the sale could not be "commercially reasonable" under NRS 104.9610. A disposition of severely impaired collateral cannot reflect fair market value.

¶45. Because Defendants failed to provide authenticated notification and conducted a commercially unreasonable disposition, any claimed deficiency is barred under NRS 104.9626, and in all events must be reduced to zero with statutory damages under NRS 104.9625. Any uncertainty in value and deficiency calculation is resolved against the non-complying secured party under NRS 104.9626–.9627.

¶46. Plaintiff has been damaged by these violations and seeks all remedies available under NRS 104.9625 and 104.9626, including statutory damages and an absolute bar on any deficiency claim.

**COUNT II: BREACH OF CONTRACT**

**FAILURE TO PROTECT COLLATERAL**

**(Nevada Common Law) — Against NFCU and Does (through Agency)**

¶47. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶48. The Loan Agreement (Exhibit K) is a valid and enforceable contract. The Security Agreement within the Loan Agreement expressly requires NFCU to "protect the collateral" and imposes duties of reasonable care in its custody. Furthermore, the Security Agreement (Exhibit K, Page 2) expressly states: "The owner(s) will appoint Navy Federal as owner(s)' attorney-in-fact with limited authority to take such steps and accomplish such acts as Navy Federal may deem necessary to perfect and continue the perfection of the security interest created by this Security Agreement and to protect the collateral."

¶49. The Security Agreement expressly requires NFCU to "protect the collateral." By accepting appointment as Plaintiff's attorney-in-fact for this specific purpose, NFCU assumed the express contractual duties stated in the agreement. This express contractual duty included preserving the Vehicle's value, following manufacturer guidance, and refraining from conduct that foreseeably damaged the collateral.

¶50. NFCU, directly and through its agents Speedy Recovery, ADESA, and other Doe Defendants, materially breached this express contractual duty by: (a) storing the high-value electric vehicle outdoors in 106°F Nevada heat, contrary to Tesla's manufacturer guidelines (Exhibit X); (b) allowing the sensitive high-voltage battery to discharge to 0%, a state known to cause permanent damage; (c) towing the vehicle without engaging Tesla's proprietary "Tow Mode," thereby causing foreseeable damage to the drivetrain and battery; and (d) failing to exercise basic care, resulting in the need to commission a replacement key fob.

¶51. This breach directly and proximately caused catastrophic failure of the Vehicle's high-voltage battery, as confirmed by Tesla's official service invoice which mandates a full replacement at a cost of $12,000–$18,000 (Exhibit 2). The vehicle's severe degradation, providing only ~90 miles of range at a "100%" charge (Exhibit EE), is a direct result of this breach.

¶52. As a direct result of NFCU's breach of its express contractual duty to protect the collateral, Plaintiff has suffered substantial damages, including the cost of the battery replacement and the profound diminution in the Vehicle's value.

## COUNT III: BREACH OF CONTRACT AND
## IMPLIED COVENANT OF GOOD FAITH

**(Nevada Common Law) — Against NFCU**

¶53. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶54. Under May v. Anderson, 119 P.3d 1254 (Nev. 2005), breach of contract requires: (1) a valid contract; (2) plaintiff's performance or excuse; (3) defendant's breach; and (4) damages. Under Hilton Hotels v. Butch Lewis Prods., 808 P.2d 919 (Nev. 1991), every contract includes an implied covenant not to frustrate the other party's benefits.

¶55. The Loan Agreement (Exhibit K) is a valid contract. Plaintiff performed, or her performance was excused. NFCU breached the implied covenant of good faith and fair dealing by accepting $6,071 in payments (Exhibit K) while simultaneously planning a repossession without providing Plaintiff with a meaningful opportunity to cure, thereby engaging in a "gotcha" repossession designed to frustrate Plaintiff's right to the benefits of the loan agreement. NFCU further breached the covenant by concealing its repossession intent, hiding account access, and proceeding to sale

without notice, all of which frustrated Plaintiff's reasonable expectations under the Loan Agreement.

## COUNT IV: WRONGFUL REPOSSESSION & CONVERSION

**(NRS 104.9609, 104.9610) — Against All Defendants**

¶56. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶57. Under Nevada Nat'l Bank v. Huff, 94 Nev. 506 (1978), creditors repossessing without UCC compliance or with breach of peace are liable for conversion. Under NRS 104.9609(2), repossession must be without breach of the peace.

¶58. Seizing a vehicle from an ADA-reserved space in 106°F heat, depriving the debtor of immediately needed medication, and precipitating a medical emergency constitutes a breach of the peace under NRS 104.9609(2). Because the repossession occurred with a breach of the peace, Defendants lacked a present right to possession; continued detention and disposition constituted conversion.

¶59. This conduct also constituted conversion by wrongfully exercising dominion over Plaintiff's vehicle and medical equipment, depriving her of their use during a medical crisis. Defendants wrongfully seized and mishandled Plaintiff's medical equipment, prescriptions, and household goods, delivering them in trash bags without vehicle access.

## COUNT V: TRESPASS TO CHATTELS

**(Nevada Common Law) — Against Speedy Recovery and Does**

¶60. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶61. At the time of the repossession, Plaintiff was the lawful owner of personal property located within the Vehicle, including an inhaler, EpiPen, Ativan, Humalog insulin pen, and prescription medications (Exhibit G).

¶62. Defendant Speedy Recovery, by its agents and employees, intentionally and without authorization, seized, exercised control over, and dispossessed Plaintiff of this personal property, depriving her of the use of her life-sustaining medical equipment during a medical emergency, causing immediate and severe harm.

## COUNT VI: NEGLIGENCE / NEGLIGENCE PER SE

**(Nevada Common Law) — Against All Defendants**

¶63. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶64. Under NRS 104.9207(1), 104.9609, and Scialabba v. Brandise Const. Co., 921 P.2d 928 (Nev. 1996), adopting Restatement (Second) of Torts § 323, Defendants owed a duty of reasonable care in repossession and collateral custody. These duties are independent of the contractual relationship: (1) the common law duty of reasonable care in handling another's property; (2) statutory duties under NRS 104.9207 and 104.9609; and (3) duties under Nevada's special relationship doctrine for bailees. The economic loss doctrine does not bar these claims because

Defendants breached duties independent of the contract. See Halifax Fin. Grp. v. Lawson, 2017 WL 2839645, at *4 (D. Nev. June 29, 2017).

¶65. Defendants breached this duty by: (a) Speedy seizing medical equipment from an ADA-reserved accessible parking space in 106°F heat without notice (Section IV.B), causing a seizure (Exhibits A, B, I); and (b) all Defendants failing to exercise reasonable care in storing and handling the Vehicle, causing battery damage (Section IV.C), including storing the Tesla outdoors in extreme heat, allowing the battery to discharge to 0%, towing without Tow Mode contrary to Tesla's manufacturer guidelines (Exhibit X), and commissioning unauthorized key fobs.

¶66. The physical harm includes: (a) the documented seizure requiring emergency treatment immediately following the repossession; (b) permanent battery damage to the Vehicle; and (c) exacerbation of Plaintiff's seizure disorder. Defendants knew or should have known of Plaintiff's disability (Exhibit I), owing a heightened duty.

¶67. Defendants' violations of NRS 104.9207(1) and 104.9609 constitute negligence per se. Tesla's Owner's Manual corroborates the applicable standard of care and the foreseeability of harm from towing without Tow Mode and allowing deep discharge.

## COUNT VII: EXPLOITATION OF A VULNERABLE PERSON

**(NRS 41.1395) — Against All Defendants**

¶68. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶69. Plaintiff is a "vulnerable person" as defined by NRS 41.1395(4) due to medically documented seizure disorders substantially limiting major life activities including walking, driving, caring for herself, and regulating bodily functions (Exhibits A, B, I).

¶69A. A vulnerable person includes one with a physical or mental impairment that substantially limits a major life activity. NRS 41.1395(4)(e).

¶70. The valid ADA handicap placard displayed in the vehicle's window, combined with the visible medical equipment (inhaler, EpiPen, Ativan, insulin pen) in the car, provided clear and obvious notice to Defendants' agent, Speedy Recovery, that Plaintiff had physical and mental impairments that substantially limited her major life activities, including mobility and self-care. In Nevada, a handicap placard is legally sufficient notice of a qualifying disability. Defendants therefore had actual knowledge of Plaintiff's vulnerable person status when they proceeded with the repossession and exploitation.

¶71. The exploitation included: (1) targeting Plaintiff's disability-accessible parking space; (2) seizing essential medical equipment knowing of her medical conditions; (3) causing a documented seizure through abandonment in extreme heat; (4) concealing account information to prevent access to payoff/redemption rights; and (5) disposing of the vehicle after receiving litigation notice, destroying evidence of the exploitation.

¶72. Under NRS 41.1395(1), the Court shall award two times the actual damages sustained, plus costs. This mandatory double damages provision applies to Plaintiff's compensatory damages including medical expenses, property loss, economic harm, and emotional distress damages.

¶72A. The Court shall award two times the actual damages sustained, plus costs and reasonable attorney's fees. NRS 41.1395(1).

## COUNT VIII: FAIR CREDIT REPORTING ACT

**(15 U.S.C. § 1681s-2(b)) — Against NFCU**

¶73. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶74. Plaintiff filed direct disputes with Experian, Equifax, and TransUnion in July–August 2025, providing her NFCU account number, VIN, and detailed explanation of the disputed information (Exhibit W-2, "Grid Code K," $27,118 balance). Under 15 U.S.C. § 1681i(a)(2) and standard CRA procedures, credit reporting agencies automatically notify furnishers of qualified disputes within five business days of receipt. NFCU's continued reporting of the exact same disputed information after these dates creates a reasonable inference that NFCU received the notices from the credit reporting agencies and failed to conduct a reasonable investigation as required by 15 U.S.C. § 1681s-2(b).

¶75. Upon information and belief, based on NFCU's continued reporting of identical disputed information and industry standard CRA procedures, the credit reporting agencies (Experian, Equifax, and TransUnion) notified NFCU of Plaintiff's disputes as required by 15 U.S.C. § 1681i(a)(2), thereby triggering NFCU's investigation duties under 15 U.S.C. § 1681s-2(b). Discovery will confirm the dates and contents of these notifications.

¶76. After receiving notice of Plaintiff's disputes from the credit reporting agencies pursuant to 15 U.S.C. § 1681i(a)(2), NFCU failed to comply with § 1681s-2(b), violating its duty to conduct a reasonable investigation. Plaintiff seeks relief for willful and/or negligent noncompliance under 15 U.S.C. §§ 1681n and 1681o, including actual, statutory, and punitive damages, together with costs.

## COUNT IX: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

**(42 U.S.C. § 12203(b)) — Against All Defendants**

¶77. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶78. By repossessing the Vehicle from an ADA-reserved accessible parking space while a valid placard was displayed, Defendants interfered with Plaintiff's right to equal access to public accommodations under 42 U.S.C. § 12182. The handicap space was Plaintiff's necessary access point to the Downtown Summerlin shopping center. By stranding her without her vehicle or medical equipment, Defendants effectively denied her the ability to access the public accommodation and return

home safely, which is part of the "full and equal enjoyment" protected by the ADA. This conduct constitutes interference, coercion, and intimidation in violation of 42 U.S.C. § 12203(b).

¶79. Specifically, Defendants intentionally interfered with, coerced, and intimidated Plaintiff in the exercise of her rights under the ADA by: (1) targeting an ADA-reserved accessible parking space for repossession despite visible disability indicators (valid placard displayed in the vehicle's window); (2) seizing essential medical equipment (inhaler, EpiPen, Ativan, insulin) that Plaintiff requires to manage her disability; (3) stranding Plaintiff in 106°F heat, creating dangerous conditions they knew or should have known would cause medical distress; and (4) denying her equal access to and enjoyment of the Downtown Summerlin shopping center and the ability to safely return home.

¶80. Defendants knew of Plaintiff's disability status through the visible ADA placard displayed in the vehicle's window at the time of repossession and the presence of life-sustaining medical equipment in the vehicle, yet proceeded with the repossession in a manner calculated to cause harm and interfere with her disability-related rights.

¶81. This conduct violated 42 U.S.C. § 12203(b), which prohibits interference with any individual in the exercise or enjoyment of rights granted or protected by the ADA. See Duvall v. County of Kitsap, 260 F.3d 1124, 1135–38 (9th Cir. 2001) (discussing the ADA's interference, coercion, and intimidation provision).

¶82. Plaintiff shops at Downtown Summerlin weekly and necessarily uses ADA-reserved parking due to permanent seizure-related and mobility impairments. NFCU continues to employ the same repossession vendors and protocols in Clark County.

¶83. Absent an injunction prohibiting repossessions from ADA-reserved spaces and mandating contractor training, audits, and compliance reporting, Plaintiff faces a real and immediate threat of repeated interference with her Title III rights. See 42 U.S.C. § 12203(b); 42 U.S.C. § 12188(a).

¶84. Relief: Plaintiff seeks injunctive relief under 42 U.S.C. § 12188(a) and § 12203(b) requiring NFCU to adopt, implement, and monitor policies that (a) prohibit repossessions from ADA-reserved accessible spaces at public accommodations; (b) require contractor and sub-agent training on disability accommodations and emergency medical needs, including retrieval protocols for essential medical equipment; and (c) implement compliance audits and reporting. NFCU is liable for the acts of its agents and contractors. Plaintiff does not seek monetary damages under Title III; monetary relief for the same conduct is sought under Nevada law and the UCC/tort counts. Attorneys' fees under 42 U.S.C. § 12205.

**COUNT X: VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

**(15 U.S.C. § 1691 et seq.) — Against NFCU**

¶85. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶86. NFCU, a creditor under ECOA and 12 C.F.R. § 1002.2(m), engaged in conduct that constituted unlawful sex discrimination based on gender identity in the servicing and collection of Plaintiff's credit account. Consistent with the CFPB's 2022 Official Interpretation to Regulation B, discrimination based on gender identity constitutes sex discrimination prohibited by ECOA.

¶87. NFCU's discriminatory documentation demands directly blocked Plaintiff's access to credit accommodations—specifically forbearance, payment plans, and loan modifications that could have prevented default and repossession. By imposing impossible verification barriers based on gender identity, NFCU effectively denied these credit accommodations while providing them to cisgender borrowers, making this discrimination "in connection with a credit transaction" under 12 C.F.R. § 1002.2(m). This pattern included initially claiming Plaintiff was an "unauthorized third party" in CFPB Complaint #250712-22270607 despite Plaintiff providing complete account identifiers, loan number, VIN, and correspondence history, then demanding extraordinary documentation including birth certificate, multiple forms of ID, and legal name change court orders before acknowledging Plaintiff's identity—documentation not uniformly required of cisgender borrowers seeking the same account access and credit accommodations.

¶88. The discriminatory conduct includes: (1) NFCU's initial denial that Plaintiff was their customer despite Plaintiff providing complete loan identifiers, account

number, VIN, and correspondence history; (2) dismissing Plaintiff's first CFPB complaint by falsely claiming Plaintiff was "not our customer" despite having complete account information; (3) requiring extraordinary documentation including birth certificate, multiple forms of ID, and legal name change documents as a prerequisite to accessing her account and requesting forbearance; (4) only acknowledging Plaintiff's identity and responding to her second CFPB complaint after submission of transgender-specific documentation; (5) concealing account information in "inactive" sections to impede access while maintaining normal account access for other borrowers; and (6) denying forbearance and accommodation opportunities through a pattern of requiring excessive verification not imposed on similarly situated borrowers.

¶89. Upon information and belief, NFCU's standard procedure for cisgender name changes (e.g., due to marriage) requires only a marriage certificate, while transgender borrowers must provide extraordinary documentation including birth certificates and court orders. This belief is based on: (a) NFCU's own conduct in initially denying Plaintiff's identity despite having complete account information, then only acknowledging her after demanding birth certificate, multiple IDs, and court orders; (b) the disproportionate burden imposed on Plaintiff compared to the routine nature of name-change processing for other borrowers; and (c) NFCU's failure to require similar extensive verification when Plaintiff used her former legal name prior to transition. Upon information and belief, and as discovery will show, NFCU's policy and practice requires this extraordinary documentation for

name/gender marker updates for transgender borrowers that imposes a significantly disproportionate burden compared to cisgender borrowers, thereby creating disparate treatment and disparate impact in violation of ECOA and Regulation B.

¶90. NFCU's adverse actions (account concealment, denial of accommodations, aggressive collection through repossession) were taken without proper adverse action notice under 12 C.F.R. § 1002.9(a)(2). This pattern constituted discrimination and notice violations under ECOA. These constitute adverse actions under 12 C.F.R. § 1002.2(c), yet no compliant notice issued under 12 C.F.R. § 1002.9(a)(1).

¶91A. Each denial or obstruction of accommodation, forbearance, or modification constituted an adverse action under 12 C.F.R. § 1002.2(c); NFCU issued no written adverse-action notice stating specific reasons as § 1002.9(a)(1) requires.

¶92. This conduct entitles Plaintiff to compensatory damages, punitive damages up to $10,000, and injunctive relief under 15 U.S.C. § 1691e.

¶92A. NFCU's "unauthorized third party" representation to the CFPB—made despite Plaintiff providing complete account information, loan number, VIN, and correspondence history—constitutes discriminatory gatekeeping under ECOA. Upon information and belief, NFCU does not require the same level of extraordinary verification (birth certificates, multiple forms of ID, court orders) from cisgender borrowers seeking account access or credit accommodations after routine name

changes such as marriage. This disparate treatment based on gender identity violates 12 C.F.R. § 1002.4(a).

**COUNT XI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Nevada Common Law) — Against All Defendants**

¶93. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶94. Under Star v. Rabello, 97 Nev. 124 (1981), and Miller v. Jones, 970 P.2d 571 (Nev. 1998), IIED requires extreme and outrageous conduct causing severe distress.

¶95. Defendants' conduct was extreme and outrageous, including: (1) seizing Plaintiff's vehicle from an ADA-reserved accessible parking space in 106°F heat while she was attending medical appointments; (2) confiscating life-sustaining medical equipment (inhaler, EpiPen, Ativan, insulin) triggering a documented seizure; (3) stranding Plaintiff in dangerous heat conditions; (4) humiliating Plaintiff by returning her personal belongings in trash bags; and (5) NFCU's deliberate misidentification of Plaintiff despite having her loan number, VIN, and correspondence history, requiring additional transgender-related documentation including birth certificates and multiple forms of ID solely based on her gender identity.

¶96. The outrageousness is found in the deliberate combination of (a) targeting a visibly marked disability parking spot, (b) in life-threatening 106°F heat, (c) seizing

life-sustaining medication, and (d) stranding a disabled individual, which Defendants knew or should have known would cause severe medical and emotional harm. The visible handicap placard displayed in the vehicle's window provided clear notice to Defendants of Plaintiff's vulnerable status.

¶97. The severe emotional distress manifests as: (a) documented medical treatment for anxiety and trauma following the repossession; (b) ongoing seizure disorder exacerbation directly linked to the incident; (c) sleep disturbances and hypervigilance regarding parking and vehicle security; and (d) avoidance of returning to Downtown Summerlin due to fear of similar incidents. This exceeds ordinary emotional distress and constitutes severe distress under Nevada law.

## COUNT XII: FDCPA VIOLATION

**(15 U.S.C. § 1692f(6)) — Against Speedy Recovery, Inc.**

¶98. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶99. Defendant Speedy Recovery qualifies as a "debt collector" solely for purposes of 15 U.S.C. § 1692f(6) because it enforces security interests by regularly engaging in nonjudicial repossessions. See 15 U.S.C. § 1692a(6); Montgomery v. Huntington Bank, 346 F.3d 693, 700–01 (6th Cir. 2003); Obduskey v. McCarthy & Holthus LLP, 139 S. Ct. 1029, 1038–39 (2019) (entities engaged solely in security-interest enforcement fall within FDCPA only for § 1692f(6)).

¶100. Speedy violated § 1692f(6) by engaging in unfair practices during collection. Under 15 U.S.C. § 1692f(6) and NRS 104.9609(2), repossession must occur without breach of the peace.

¶101. Specifically, Speedy's seizure of the vehicle from an ADA-reserved accessible parking space in 106°F heat while confiscating life-sustaining medical equipment constituted a breach of the peace under NRS 104.9609 and an unfair practice under § 1692f(6). The repossession endangered Plaintiff's health and safety, created a public disturbance, and violated the peace of the community during a medical emergency. Because the repossession was conducted with a breach of the peace and in violation of applicable notice and custody requirements, Speedy lacked a present right to possession of the vehicle for purposes of 15 U.S.C. § 1692f(6).

¶102. This conduct constituted unfair and unconscionable collection practices prohibited by the FDCPA. Plaintiff seeks damages under 15 U.S.C. § 1692k.

**COUNT XIII: NEGLIGENT HIRING, RETENTION, AND SUPERVISION (Nevada Common Law) — Against NFCU**

¶103. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶104. Under Hall v. SSF, Inc., 930 P.2d 94 (Nev. 1996), NFCU owed a duty to properly select, train, and supervise its repossession contractors.

¶105. NFCU failed to ensure Speedy's compliance with ADA requirements, UCC duties of reasonable care, and Tesla-specific handling protocols (Sections IV.B, C). NFCU knew or should have known that Speedy's conduct posed risks to disabled borrowers and high-value collateral, yet failed to implement adequate training, oversight, or quality control measures.

¶106. NFCU's negligence in hiring, retaining, and supervising Speedy directly caused Plaintiff's injuries and damages. Plaintiff seeks compensatory and punitive damages.

## COUNT XIV: INTENTIONAL SPOLIATION (PLEADED IN THE ALTERNATIVE; PRIMARY REMEDY UNDER RULE 37(e))

**(Nevada Common Law) — Against All Defendants**

¶107. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

¶108. Plaintiff pleads this count in the alternative to preserve all remedies; Plaintiff's primary relief for loss of ESI is sought under Fed. R. Civ. P. 37(e) and the Court's inherent authority. If Nevada law is construed to foreclose an independent tort, the allegations herein support punitive damages, adverse inferences, and fee-shifting as set out in Section VII.

¶109. No later than August 9, 2025, when Plaintiff served Defendants with a formal litigation-hold letter, and through CFPB complaints acknowledging impending

litigation, Defendants were on notice of pending litigation and had a duty to preserve all evidence related to the Vehicle, including the physical vehicle itself and its embedded electronic data (telemetry, key-pair logs, service history, charging records, and towing logs).

¶110. Defendants sold the Vehicle despite knowing it contained embedded electronic evidence (telemetry, logs, battery data) critical to Plaintiff's claims. Selling a Tesla—a computer on wheels—after a litigation hold is fundamentally different from selling an ordinary car. A reasonable party would have imaged the data or preserved the vehicle for inspection. The timing—immediately after the August 9, 2025 litigation hold—supplies the requisite intent.

¶111. Despite this duty, Defendants intentionally sold and transferred the Vehicle identified by VIN ***9112 after August 9, 2025, thereby destroying the aforementioned native ESI and making it impossible for Plaintiff to conduct a full forensic analysis to confirm the exact extent of their mishandling, the cause of battery degradation, and whether the disposition was commercially reasonable.

¶112. Defendants were aware that the Vehicle and its embedded data were critical evidence for Plaintiff's claims of battery damage, improper handling, breach of the duty to protect collateral, and commercially unreasonable disposition. Every agent, contractor, and Doe Defendant involved in the disposition acted as an agent, ostensible agent, or sub-agent of NFCU in furtherance of this spoliation.

¶113. The destruction of this evidence has severely prejudiced Plaintiff's ability to prove the full extent of damages and Defendants' misconduct. Plaintiff seeks compensatory damages, punitive damages, and sanctions for this intentional spoliation.

¶113A. The same pattern of concealment evident in NFCU's handling of the CFPB investigation—58 days of claiming unavailability followed by sudden production after litigation—extends to the destruction of the Vehicle's embedded ESI. NFCU sold the Vehicle after receiving Plaintiff's August 9, 2025 litigation-hold letter, destroying telemetry and service records that would definitively establish the extent of battery damage, whether Tow Mode was engaged, storage conditions, and charging patterns. This destruction of forensic evidence, combined with NFCU's demonstrated willingness to produce questionable documents only under litigation pressure, warrants adverse inferences regarding the destroyed ESI.

¶113B. NFCU's conduct throughout this matter—from identity denial to document concealment to evidence destruction—demonstrates a systematic pattern warranting sanctions under the Court's inherent authority to manage its docket and deter bad faith litigation conduct. The temporal proximity of key events (CFPB document production three days after pre-suit settlement demand, vehicle sale after litigation-hold notice) supports an inference of intentional spoliation and document fabrication.

## VI. DAMAGES

¶114. Plaintiff seeks the following categories of relief, with total compensatory damages based on, but not limited to, the following components: Vehicle Value ($35,000), Battery Replacement and Property Damage from Breach of Contract ($18,000), Medical Expenses, Loss of Use, and Emotional Distress. The sum of these components, together with statutory damages, mandatory double damages under NRS 41.1395, and punitive damages, exceeds $1,000,000.

a. **Economic damages** — including loss of use of vehicle, medical costs associated with seizures and heat exposure, replacement of medical equipment, and property loss including Tesla-confirmed high-voltage battery replacement ($12,000–$18,000) caused by Defendants' breach of their contractual duty to protect the collateral and their violations of NRS 104.9207(1). Plaintiff could not mitigate damages because Defendants: (a) concealed the vehicle's location and account status in "Inactive Accounts" portals; (b) impeded redemption by hiding payoff information despite authenticated requests under NRS 104.9210; and (c) sold the vehicle while Plaintiff was attempting to exercise her statutory redemption rights. A party cannot benefit from obstacles it created. See Taylor v. State, 131 Nev. 543, 356 P.3d 1019, 1022 (2015)

b. **Non-economic damages** — including severe emotional distress, humiliation, loss of dignity, loss of independence, and suffering caused by the repossession, unsafe conditions, and resulting medical emergencies.

c. **Statutory damages** — including but not limited to damages available under the Fair Debt Collection Practices Act (15 U.S.C. § 1692k), Equal Credit Opportunity Act (15 U.S.C. § 1691e), Nevada UCC (NRS 104.9625), and NRS § 41.1395 (mandatory double damages for exploitation of vulnerable persons).

d. **Punitive damages** — pursuant to NRS § 42.005, to punish and deter reckless or intentional misconduct, including breach of contractual duties, spoliation of evidence, and disability/gender identity discrimination.

e. **Injunctive and declaratory relief** — including orders preventing further violations of the ADA, requiring correction of credit reporting, and prohibiting future repossessions in violation of the law.

f. **A declaration** under NRS 104.9626 that Defendants are absolutely barred from any deficiency because the collateral was disposed of in a commercially unreasonable manner, conclusively established by Tesla's manufacturer invoice confirming catastrophic battery failure.

## Punitive Damages Justification

¶115. Pursuant to NRS 42.005, Plaintiff seeks punitive damages based on clear and convincing evidence that Defendants' conduct constituted oppression, fraud, and/or malice. Defendants demonstrated institutional malice through: (a) corporate policies or practices allowing repossession from ADA-accessible spaces without disability accommodations; (b) systematic concealment of accounts in "inactive"

status to prevent redemption and exercise of statutory rights; (c) post-litigation destruction of evidence despite explicit preservation demands; and (d) discriminatory documentation requirements imposed as corporate policy on transgender borrowers. This pattern shows conscious disregard for consumer rights and legal obligations. "Oppression" is shown by their conscious disregard for Plaintiff's rights as a disabled person, stranding her without medical equipment in extreme heat. "Fraud" is evidenced by the concealment of account information and the false "informational only" billing statements. "Malice" is shown by the intentional, post-litigation sale of the Vehicle to destroy evidence. This conduct was despicable and committed with a conscious disregard for the rights and safety of Plaintiff, warranting severe punishment to deter similar future conduct.

## VII. REQUEST FOR ESI SANCTIONS UNDER RULE 37(e)

¶116. NFCU's duty to preserve arose no later than Plaintiff's CFPB disputes and the August 9, 2025 litigation-hold letter. After that point, NFCU (a) concealed account records in "Inactive Accounts" portals (Exhibits Z, W-3, W-4), (b) failed to preserve communications regarding the repossession decision and timing, and (c) allowed sale/transfer of the vehicle, destroying embedded vehicle ESI (telemetry, key-pair logs, service history) and third-party auction metadata.

¶117. No later than the August 9, 2025 litigation-hold letter and CFPB complaints acknowledging impending litigation, Defendants were on notice of pending litigation and had a duty to preserve all evidence related to the Vehicle, including the physical vehicle itself and its embedded electronic data.

¶118. Plaintiff seeks targeted recovery from (a) Tesla service logs and API telemetry, (b) ADESA auction metadata, and (c) NFCU/Speedy contractor email and ticketing systems.

### Plaintiff's Commitment to Proportional Discovery

¶119. To ensure discovery is proportional to the needs of the case under Fed. R. Civ. P. 26(b)(1), Plaintiff proposes a focused, phased approach:

**Phase 1:** Preservation and targeted ESI related to the repossession decision, vehicle handling, and pre-disposition notices.

**Phase 2:** Depositions of key decision-makers at NFCU and Speedy Recovery.

**Phase 3:** Damages quantification.

Plaintiff will not engage in fishing expeditions and is prepared to confer with Defendants to stipulate to reasonable discovery limits, thereby conserving party and court resources.

¶120. Under Fed. R. Civ. P. 37(e) and Ninth Circuit guidance that Rule 37(e) governs ESI sanctions, see Newberry v. Cnty. of San Bernardino, 750 F. App'x 534, 537 (9th Cir. 2018), Plaintiff seeks: (1) 37(e)(2) adverse-inference that the lost ESI would have established UCC non-compliance, breach of peace, ADA knowledge, breach of contractual duties to protect collateral, and commercially unreasonable disposition; (2) monetary sanctions and costs associated with the spoliation; and (3) in the alternative, curative measures under 37(e)(1). Plaintiff will confer regarding targeted restoration from Tesla/ADESA/NFCU sources and proposes phased ESI discovery proportional to the needs of the case. Plaintiff also requests an order compelling preservation and targeted imaging of relevant systems. Plaintiff further seeks an immediate preservation order directing NFCU, Speedy, ADESA, and their agents to preserve and suspend auto-deletion for all relevant email, ticketing, auction, and vehicle-telemetry systems.

## VIII. REQUEST FOR JUDICIAL NOTICE

¶121. Pursuant to Federal Rule of Evidence 201, Plaintiff requests that the Court take judicial notice of the following facts, which are not subject to reasonable dispute:

a. The National Weather Service report for Las Vegas, Nevada on June 18, 2025, confirming the high temperature was 106°F;

b. The Nevada Uniform Commercial Code statutes, specifically NRS 104.9207, 104.9609, 104.9610, 104.9611, 104.9613, 104.9614, 104.9625, and 104.9626;

c. The Consumer Financial Protection Bureau's 2022 Official Interpretation to Regulation B (12 C.F.R. Part 1002, Supplement I to Part 1002), which clarifies that discrimination based on gender identity constitutes sex discrimination under the Equal Credit Opportunity Act.

## IX. MOTION FOR LEAVE TO AMEND

¶122. Pursuant to Fed. R. Civ. P. 15(a)(2), Plaintiff respectfully requests leave to amend this Complaint to add parties, claims, or factual detail as warranted by the evidence developed in discovery. Plaintiff commits to seeking leave without undue delay and will not seek amendment for dilatory purposes.

## X. PRAYER FOR RELIEF

Plaintiff seeks damages well in excess of $1,000,000, plus statutory, double, and punitive damages as permitted by law:

## DAMAGES

1. Compensatory damages in an amount to be proven at trial, but not less than $1,000,000;

2. Punitive damages under NRS 42.005 in an amount to be determined at trial;

3. Mandatory double damages under NRS 41.1395 (exploitation of vulnerable person);

4. Statutory minimum damages for consumer-goods collateral under NRS 104.9625(3)(b), and absolute bar on any claimed deficiency under NRS 104.9626(1);

5. ECOA damages against NFCU, including punitive up to $10,000 under 15 U.S.C. § 1691e(b);

6. FCRA damages against NFCU for willful noncompliance with 15 U.S.C. § 1681s-2(b), pursuant to 15 U.S.C. §§ 1681n & 1681o;

7. FDCPA damages against Speedy Recovery, Inc. up to $1,000 under 15 U.S.C. § 1692k(a)(2)(A);

## INJUNCTIVE RELIEF

8. Injunctive relief under 42 U.S.C. § 12188(a) requiring the ADA policies and trainings described in Count IX;

9. Disgorgement and a constructive trust over all proceeds traceable to the unlawful disposition of the Vehicle, to be deposited with the Court pending a

full accounting, and a complete Article 9 accounting (NRS 104.9615, 104.9616, 104.9210);

10. An order pursuant to Fed. R. Civ. P. 34 and the Court's inherent authority compelling NFCU, Speedy Recovery, ADESA, and all agents to immediately preserve and produce all available electronic data related to the Vehicle (VIN ***9112), including but not limited to: (a) all telemetry data, charging logs, service records, and key-pair access logs from Tesla, Inc.; (b) all auction records, condition reports, and metadata from ADESA and other auction agents; (c) all assignment records, GPS tracking data, and towing logs from Speedy Recovery and transportation contractors; and (d) all email, ticketing system, and internal communications regarding the repossession, storage, and disposition of the Vehicle, with production to occur within 14 days of the Court's order;

11. Production of adverse-action notice under 12 C.F.R. § 1002.9;

12. Require production of a full UCC § 9-210 / NRS 104.9210 accounting and NRS 104.9615 (application of proceeds/surplus/deficiency), including payoff/redemption figures and explanation of calculation;

## DECLARATORY RELIEF

13. Declaration that Defendants' noncompliance with NRS 104.9611, 104.9613, and 104.9614, combined with commercially unreasonable disposition under

NRS 104.9610, absolutely bars any deficiency under NRS 104.9626, with damages under NRS 104.9625;

## COSTS AND SANCTIONS

14. Rule 37(e) relief: (a) an adverse-inference instruction that the lost ESI would have established Defendants' UCC non-compliance, breach of peace, ADA knowledge, breach of contractual duties, and commercially unreasonable disposition; (b) monetary sanctions and costs associated with the spoliation; and (c) forensic imaging and targeted ESI discovery to restore or replace lost data where feasible;

15. Pre- and post-judgment interest;

16. Attorneys' fees and costs for any period in which Plaintiff is represented by counsel, including all fees incurred after counsel succession, where authorized by 15 U.S.C. § 1692k(a)(3) (FDCPA), 15 U.S.C. § 1691e(d) (ECOA), 42 U.S.C. § 12205 (ADA), and NRS 18.010(2)(b), and taxable costs;

17. Costs under applicable statutes, including NRS 41.1395 and federal consumer protection laws;

18. Further relief as the Court deems just.

19. Sanctions under the Court's inherent authority for systematic bad faith litigation conduct, including but not limited to monetary sanctions, adverse inferences, and fee-shifting, based on the pattern of evidence concealment,

questionable document production timing, and destruction of ESI after receiving litigation-hold notice.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable under Fed. R. Civ. P. 38.

Dated: October 6th, 2025

Respectfully submitted,

/s/ Jade Riley Burch

Jade Riley Burch

Plaintiff, Pro Se

## NOTICE OF SERVICE INTENT

Plaintiff will effect service on Defendant Navy Federal Credit Union pursuant to Fed. R. Civ. P. 4(h)(1)(B) by delivering the summons and complaint to Navy Federal Credit Union, Attn: Legal Department / Registered Agent, 820 Follin Lane SE, Vienna, VA 22180, within the time permitted by Rule 4(m).

Plaintiff will effect service on Defendant Speedy Recovery pursuant to Rule 4(h) at 4517 Vandenberg Dr, North Las Vegas, NV 89081, to an officer or other agent authorized by appointment or law.

## MASTER EXHIBIT INDEX

**Exhibits Filed with Complaint**

*(these three are physically attached to the complaint at filing)*

**Exhibit 1** – Photograph of Plaintiff's Valid ADA Handicap Placard (displayed at time of repossession)

**Exhibit 2** – Tesla Service Invoice (September 2025) Confirming High-Voltage Battery Replacement

**Exhibit 3**- Loan Agreement (ePromissory Note, Security Agreement, and Disclosure) also designated as Exhibit K

---

**Primary Evidence Exhibits**

*(to be filed in discovery or motion practice)*

**Exhibit A** – Post-Repossession Seizure Log (June 18, 2025 medical emergency)

**Exhibit B** – Neurologist Note Confirming Seizures Triggered by Repossession

**Exhibit C** – Valid ADA-Reserved Accessible Placard (ADA-Protected Status at Time of Seizure)

**Exhibit D** – Photo of ADA Accessible Parking Space Where Vehicle Was Taken

**Exhibit D-2** – Alternate Angle of Repossession Location

**Exhibit E** – Tesla App Screenshot Showing Unauthorized Vehicle Movement / 0%

Battery

**Exhibit F** – Plaintiff's Declaration and Account Records Evidencing Absence of Required Notices

**Exhibit G** – Evidence of Seizure of Life-Sustaining Medical Equipment (Inhaler, EpiPen, Ativan, Humalog Insulin Pen, Prescriptions)

**Exhibit H** – National Weather Service Report – 106°F on Day of Repossession

**Exhibit I** – Medical Documentation of Seizure Disorders / Disability Diagnosis

**Exhibit J** – Nevada UCC Article 9 Violations – Statutory Framework, Elements, and Remedies

**Exhibit K** – Loan Agreement (ePromissory Note, Security Agreement, and Disclosure)

**Exhibit L** – Systematic Misrepresentation – "Informational Only" Disclaimer Used to Evade Laws

**Exhibit M** – Comprehensive Damages Analysis – Including Rental Vehicle/Substitute Transportation Costs and Loss-of-Use Ledger

**<u>Expanded Exhibit P – Post-Repossession Billing & Records Issues</u>**

**Exhibit P** – Post-Repossession Billing Scheme – Demands for Payment on Illegally Seized Property

**P-1** – NFCU Billing Statement – Post-Repossession Balance Demand

**P-2** – NFCU Payment Ledger Extract – Continued Debiting After Seizure

**P-3** – NFCU Collection Notice – Balance Acceleration Without Cure Rights

**P-4** – Post-Sale Statement – Demand for Deficiency on Illegally Sold Vehicle

**P-5** – NFCU Internal Communication re: "Informational Only" Disclaimer

**P-6** – CFPB Complaint Acknowledgment – Billing/Collection After Litigation Hold

**P-7** – Certified Mail Proof – Cease & Desist / Billing Objection

**P-8** – NFCU Silence Documentation – Ignored Notices

**P-9** – Express Mail Proof – Settlement Demand Delivery / Billing Scheme Reference

**P-10** – CFPB Call Notes – NFCU Confirming Litigation Channel Only

**P-11** – Billing Portal Screenshot – Inactive Account / Hidden Balance Section

**P-12** – Tesla App Logs – Sale Prep While Billing Continued

**P-13** – Account Dashboard Screenshot – "Deleted Loan Account" Concealment

**P-14** – Tesla Service Invoice – confirming HV battery replacement (duplicate of Exhibit 2 for P-series continuity)

**Financial and Account Evidence**

**Exhibit R** – Consolidated Financial Ledger – Rentals, Supercharger Fees, Medical Costs, Loss-of-Use Valuation

**Exhibit S** – Chronological Timeline – Repossession, Seizure, Account Deletion, CFPB Complaint, and Silence

**Exhibit V** – Tesla Supercharger Session Records and Fees; Battery Degradation/Idle-Fee Evidence

**Exhibit W** – Evidence of Bad Faith Silence (Ignored Certified & Express Mail, Emails, CFPB Complaint)

**W-2** – Credit Report Showing False Repossession Information

**W-3** – Hidden Billing Statements from "Inactive Accounts" Section

**W-4** – Additional Suppressed Statements & Portal Screenshots

**Exhibit X** – Tesla Owner's Manual (Extreme Temperature and Tow Mode Warnings)

**Exhibit Y** – Tesla Invoice Confirming Key Fob Replacement for VIN ending 9112

**Exhibit Z** – Screenshot of Deleted Loan Account from Navy Federal Online Dashboard

**Supporting Documentation**

**Exhibit AA** – Witness Affidavit of Repossession and Medical Emergency Care

**Exhibit BB** – Contract & Statutory Excerpts – Nevada UCC §§ 104.9611 & 104.9614 Notice Requirements (side-by-side with NFCU's actions)

**Exhibit CC** – Enforcement Precedents – CFPB/FTC Case Summaries Showing $10M–$50M Fines for Similar Practices

**Exhibit DD** – Tesla App Screenshot Evidence of Unlawful Sale & Ongoing Ownership

**Exhibit EE** – Tesla Battery Degradation Evidence (service invoice, app screenshots showing ~90-mile range at "100%")

#END#